IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUZZMARKETING, LLC, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE UPPER DECK COMPANY, LLC, | : | No. 03-4392 |
|     Defendant. | : | |

<u>**MEMORANDUM AND ORDER**</u>

Schiller, J.                                                                                                                  May 6, 2004

    Plaintiff Buzzmarketing LLC ("Buzzmarketing") brings this suit against Defendant The Upper Deck Company LLC ("Upper Deck") alleging four causes of action: (1) breach of written contract; (2) breach of oral contract; (3) breach of implied-in-fact contract; and (4) unjust enrichment/quantum meruit. Defendant has moved for summary judgment, arguing that Plaintiff cannot meet its burden of demonstrating the existence of any written, oral, or implied contract or any actions that would give rise to a quantum meruit claim. For the reasons set out below, the Court grants summary judgment in favor of Upper Deck.

**I.    FACTUAL BACKGROUND**

    The following facts are undisputed, except where specifically noted otherwise. Buzzmarketing is an advertising firm incorporated in Pennsylvania (Compl. ¶ 1); Upper Deck is a California-based producer of toys (Compl. ¶ 2). In January 2003, Upper Deck contacted Buzzmarketing as part of a search for marketing firms to handle the launch of a new toy, named "Breakey." (Hughes Dep. at 59.) The following month, Upper Deck's Vice President of Sales Rich Henry attended an exhibition in New York, where he met with Buzzmarketing CEO Mark Hughes.

1

After discussing the Breakey product, Henry requested that Hughes prepare a marketing proposal for Upper Deck to evaluate. (*Id*. at 69-70.) Upper Deck rejected each of the first four proposals, which were sent between March and April 2003. (*Id*. at 71-72, 157, 160-61; Def.'s Mot. for Summ. J. at 3-5.) On approximately April 15, Buzzmarketing sent to Upper Deck the final proposal, which is the proposal at issue in this case. (Hughes Dep. Ex. 18 at 2.) That proposal described a domestic marketing campaign that entailed, in relevant part, paying a popular music group to endorse the product. (*See* Hughes Decl. ¶ 6.) The proposal also contained a clause stating that "[t]his Agreement may be executed in counterparts and facsimile signatures shall suffice as originals." (Hughes Dep. Ex. 7 at 8.)

On May 14, Henry and Hughes had a phone conversation regarding the final proposal. (Hughes Decl. ¶ 4; Def.'s Mot. for Summ. J. at 6.) The content of this conversation is in dispute: Buzzmarketing alleges that an oral contract was formed; Upper Deck states that it was merely a part of the ongoing negotiations. After the conversation, Hughes emailed an amended version of the final proposal to Upper Deck, along with a request for a $122,500.00 wire transfer. (Hughes Dep. Ex. 7 at 1.)

On May 15, in response to Hughes's request for payment, Henry sent an internal email asking Upper Deck's marketing director Louise Curcio to "follow up on getting the contract signed and [Buzzmarketing's] money wired." (Hughes Dep. Ex. 11 at 1.)

On May 30, Upper Deck's marketing manager Kristy Watson phoned Hughes to say that she would call him when the $122,500.00 was going to be wired. (Hughes Decl. ¶ 8.) That same day, Curcio left a voicemail for Hughes stating that he would be receiving the wire transfer on Monday or Tuesday of the following week. (*Id*. ¶ 9.)

On May 31, an article appeared in Billboard Magazine quoting Jeff Greenfield, of the marketing firm 1st Approach, as stating that Upper Deck would be sponsoring a music group's domestic and European tours in exchange for that group's endorsement of a new Upper Deck product. *See* Liz Skinner, *Bling! Bling! Ka-Ching!*, BILLBOARD, May 31, 2003. Greenfield subsequently informed Hughes that someone from Upper Deck (either Curcio or spokesperson Don Williams) had asked the Billboard reporter to correct the article to reflect that the marketing arrangement only covered domestic, not European, advertising. (Hughes Dep. at 119-20.)

On June 2, Upper Deck sent Hughes a revised version of the final proposal. (Hughes Dep. Ex. 15.) On June 3, Hughes sent Upper Deck further revisions to the written agreement. (*Id*. Ex. 16.) Later that day, Upper Deck responded with yet more revisions. (*Id*. Ex. 17.)

Finally, on June 11, Henry called Hughes to inform him that Upper Deck would not be launching the Breakey product, and therefore Buzzmarketing's services would not be needed. (Hughes Decl. ¶ 10.) Henry also requested an itemized list of Buzzmarketing's costs for reimbursement, which Buzzmarketing submitted but Upper Deck never paid. (*Id*.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, that party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party

3

demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for him at trial. *Anderson*, 477 U.S. at 248. In order to meet this burden, the opposing party must point to specific, affirmative evidence in the record and not simply rely on mere allegations, conclusory or vague statements, or general denials in the pleadings. *Celotex*, 477 U.S. at 324. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in ruling upon the motion. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III.   DISCUSSION

#### A.   Count I:  Breach of Written Contract

Buzzmarketing concedes that no written contract was ever executed. Thus, summary judgment is granted to Upper Deck on Count I of the Complaint.

#### B.   Count II:  Breach of Oral Contract

Buzzmarketing argues that the negotiations concerning the final proposal culminated in an oral contract formed during the May 14 conversation between Henry and Hughes. Upper Deck responds that there is no evidence that the parties formed a contract during that conversation.

Pennsylvania courts have decided two relatively recent cases regarding the question of whether parties who orally agree to the terms of an unsigned written contract are bound by the terms

of the writing.[1]  In *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 138 (Pa. 1999), the Pennsylvania Supreme Court was asked to decide whether the fact that a proposed contract contained signature lines was conclusive evidence that the parties intended to require the contract to be executed only in writing, such that an oral agreement thereon would be unenforceable.  The court held that if the contract had contained language stating the parties' intent to execute the agreement in writing, the oral agreement would indeed have been invalid, *id*. (*citing Franklin Interiors v. Wall of Fame Mgmt. Co., Inc.*, 511 A.2d 761 (Pa. 1986)), but that the absence of such language would be construed against the drafting party—the defendant.  *Id*. at 139.  Construing the absence of this contractual language in the plaintiff's favor, the court held that signature lines alone were insufficient proof of the parties' intent to execute the agreement in writing, and therefore the oral agreement to the terms of the contract would be enforced.[2]  *Id*.

Subsequently, in *Commonwealth v. On-Point Technology Sys., Inc.*, 821 A.2d 641 (Pa. Commonw. Ct. 2003), the Commonwealth Court was asked to determine whether a proposed contractual clause, stating that the contract in question would "not be fully executed and binding on

---

[1] The parties agree that Pennsylvania law governs this action, but there is some dispute within the Eastern District regarding the burden of proof required under Pennsylvania law to establish an oral contract.  Compare *Martin v. Safeguard Scientifics, Inc.*, 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998) (requiring "clear and precise evidence"), with *Zielonka v. Temple Univ.*, 2001 WL 1231746 at *9 (E.D. Pa. Oct. 12, 2001) (finding "clear and precise evidence" standard unsupported by state law and applying preponderance of evidence standard).  There is no need to resolve this dispute, however, because Buzzmarketing's claim for breach of oral contract fails as a matter of law, as discussed below.

[2] The court held that the parties had formed an oral contract based on three factors:  (1) the plaintiff had acted in reliance on the contract; (2) the plaintiff had sent correspondence clearly indicating its belief that an enforceable contract existed; and (3) the defendant had not included a contract term requiring execution to be in writing, as discussed above.  *Shovel*, 739 A.2d at 138-39.

the Parties unless and until all signatures are affixed hereto," constituted a manifestation of the parties' intent to execute the agreement only in writing. The court, interpreting *Shovel*, held that if a contract contains language requiring execution to be in writing, courts should honor the parties' intent by not enforcing an oral agreement to the terms of the writing. *See id*. at 648, 649 n.13 (noting that "the language of the proposal requests" can indicate "that a contract would not be formed until its terms are memorialized in writing and that writing is formally executed by all the parties"). The court further held that where the writing in question contained a term that clearly manifested the parties' intent only to execute the agreement in writing, and where it was undisputed that neither party had actually signed the document, it was error for a state administrative board to determine that an oral agreement was enforceable. *Id*. at 648-49.

In the instant case, the final proposal provides that "[t]his Agreement may be executed in counterparts and facsimile signatures shall suffice as originals." By describing the manner in which "signatures shall suffice" to "execute[]" the agreement, this clause clearly indicates the parties' intent to execute the agreement only by signing it. Indeed, it is difficult to conceive of any reasonable reading of this term under which the agreement could be executed without the signatures of both parties. Thus, the writing demonstrates that the parties intended to be bound only by the terms of the written document once signed. Accordingly, Plaintiff cannot as a matter of law prevail on its claim for breach of an oral agreement to the terms of the writing,[3] and summary judgment is

---

[3] The fact that the writing contains a provision requiring its execution in writing precludes the Court from considering extrinsic evidence of an oral agreement, but even if such evidence were considered, Upper Deck would prevail. The clearest evidence militating against the existence of an oral agreement is that although the oral contract was allegedly entered into on May 14, *both* parties subsequently proposed modifications to the *written* agreement. Specifically, on May 20, Upper Deck proposed amendments in an email to Hughes, and on June 3 (three weeks after the oral contract was allegedly concluded), Hughes proposed further

granted to Upper Deck on Count II of the Complaint.[4]

### C.   Count III: Breach of Implied-in-Fact Contract

Count III of the Complaint alleges that Upper Deck breached an implied-in-fact contract. As Pennsylvania courts have defined it, "[a] contract implied in fact is one where the parties assent to the formation of a contract, but instead of being expressed in words, the intention to [incur] obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct." *Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.*, 797 A.2d 385, 390 (Pa. Commw. Ct. 2002) ("The key question is what conduct of [defendant], besides negotiating, was there from which its assent to a contract . . . could be inferred . . . ."); *see also AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001) (upholding trial court finding that no implied-in-fact employment contract existed where parties' conduct did not give rise to inference of agreement on salary term). As with any contract, the agreement is enforceable only if the parties agree to the material terms. *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956) ("[I]n order for there to be an enforceable contract, the nature and extent of its obligation must be

---

modifications to the written proposal in an email to Henry. This conduct of continuing to modify the written proposal is inconsistent with the parties having already executed a binding contract on May 14; it is far more consistent with the existence of an "agreement to agree." As discussed below, *see infra* Part IV.C, agreements to agree are not enforceable as contracts when they leave material terms to further negotiation. *See Porreco v. Maleno Dev., Inc.*, 761 A.2d 629, 633 (Pa. Commw. Ct. 2000); *Miller v. Clay Township*, 555 A.2d 972 (Pa. Commw. Ct. 1989).

[4] At oral argument, Plaintiff advanced the theory, not raised in the pleadings or motion papers, that the oral contract was not based on the terms of the writing, but was instead an agreement entirely separate and apart from any written contract. Counsel conceded, however, that the parties contemplated executing this agreement in a writing at a later date, and that the draft contract proposals constituted that writing. Thus, even under this new theory, the alleged oral agreement concerned the terms of the unexecuted document, and the analysis above applies with equal force.

certain; the parties themselves must agree upon the material and necessary details of the bargain."). Thus, to make out a case of an implied-in-fact contract, Buzzmarketing must show that the parties' conduct gives rise to an inference of agreement on the material terms of a marketing agreement for the Breakey product.

The record in this case does not give rise to the inferences Buzzmarketing is required to demonstrate. First, neither party performed any of the tasks that they were allegedly expected to perform under the contract—i.e., Upper Deck never sent any payments, and Buzzmarketing never performed any marketing services. Therefore, no agreement can be inferred from any contractual performance. Second, although prior dealings between parties commonly form the basis for implied-in-fact contracts, *see, e.g., McGough v. Broadwing Communications, Inc.*, 177 F. Supp. 2d 289, 297 (D.N.J. 2001) (holding that implied-in-fact services contract was formed under Pennsylvania law where plaintiffs had been paid by defendant for same work in the past), the instant parties had no previous dealings from which a contract could be inferred. Third, the only admissible evidence that Buzzmarketing presents in support of the existence of an implied-in-fact contract is the phone and email communications in which Upper Deck appears to acknowledge that money should be wired to Hughes.[5] Upper Deck does not dispute that Henry and Hughes reached an agreement on the amount of Buzzmarketing's fee during the May 14 conversation but argues that

---

[5] Buzzmarketing cites the Billboard Magazine article in support of its contention that the parties agreed on the geographic scope of the contract and the use of a band's endorsement. As Upper Deck correctly notes, however, the article's quotation of Jeff Greenfield regarding the marketing agreement is an out-of-court statement offered for the truth of its contents and therefore is inadmissible hearsay. FED. R. EVID. 801. Similarly, the evidence regarding Upper Deck's subsequent phone call to Billboard to correct the article is double hearsay, as this evidence consists only of Hughes's testimony about statements made by Jeff Greenfield about the phone call. Thus, both the magazine article and Greenfield's statements to Hughes about the phone call to Billboard are inadmissible.

this alone is insufficient evidence to make out a case of an implied-in-fact contract. The evidence supports Upper Deck's position: When viewed in the light most favorable to Buzzmarketing, the record shows at most that the parties agreed that Upper Deck would pay Buzzmarketing $122,500.00 at an undetermined time for unspecified marketing services. This agreement cannot be construed as an implied-in-fact contract because the price term alone, in the absence of manifested agreement as to any other material term of the contract (e.g., the services that Buzzmarketing was to provide, the due dates of any payments, the scope of the agreement, etc.), is insufficient to create an enforceable contract for services. *See Porreco v. Maleno Developers, Inc.*, 761 A.2d 629, 633 (Pa. Commw. Ct. 2000) (holding that parties who agreed to settle construction-related lawsuit for specified monetary amount but could not subsequently agree to terms of construction had no enforceable agreement); *Miller v. Clay Township*, 555 A.2d 972 (Pa. Commw. Ct. 1989) (same); *Halowich v. Amminiti*, 154 A.2d 406, 409 (Pa. Super 1959) (holding that agreement to build house was unenforceable where it contained price term but did not specify number of stories, rooms, windows, or closets); *cf. On-Point Technology*, 821 A.2d at 649 n.12 (finding that contract for sale of goods was not formed where parties agreed to quantity term only); *Steven T. Flowers v. Shein & Brookman, P.A.*, 1983 WL 265400 (Pa. Ct. Com. Pl. Mar. 17, 1983) (holding that oral contract to provide marketing services was unenforceable where it specified marketing to be done but not time or compensation terms). Thus, absent evidence or conduct from which all or most of the remaining key terms could be inferred, Buzzmarketing's claim for breach of an implied-in-fact contract must fail.

      **D.**    **Count IV: Unjust Enrichment/Quantum Meruit**

Buzzmarketing concedes that recovery in quantum meruit is not warranted. Thus, summary

judgment is granted to Upper Deck on this claim.

## V.  CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BUZZMARKETING, LLC, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE UPPER DECK COMPANY, LLC, | : | No. 03-4392 |
| Defendant. | : | |

**ORDER**

**AND NOW**, this **6th** day of **May, 2004**, upon consideration of Defendant Upper Deck Company LLC's Motion for Summary Judgment or in the Alternative Partial Summary Judgment, Plaintiff Buzzmarketing LLC's response thereto, Defendant's reply, and oral argument thereon, it is hereby **ORDERED** that:

1. Defendant's Motion for Leave to File a Reply (Document No. 18) is **GRANTED**.

2. Defendant's Motion for Summary Judgment (Document No. 15) is **GRANTED**.

3. Judgment is entered in favor of Defendant and against Plaintiff.

4. The Clerk of Court is directed to close this case.

BY THE COURT:

_____
**Berle M. Schiller, J.**